IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ROBERT P. DUCKWORTH,                 :
    Plaintiff                    :
                           :
    v.                           :     Civil No. AMD 02-2064
                           :
THE STATE BOARD of ELECTIONS, :
JOHN WILLIS, SECRETARY of    :
STATE, and BOARD of          :
SUPERVISORS of ELECTIONS for :
ANNE ARUNDEL COUNTY,         :
    Defendants                   :

...o0o...

### MEMORANDUM

This case presents a challenge to the 2002 Congressional Districting Plan for Maryland. Plaintiff, Robert P. Duckworth ("Duckworth" or "plaintiff), filed the action on June 18, 2002, against The State Board of Elections (misnamed as "The State Administrative Board of Election Laws"), Nancy Kropp, in her official capacity as State Treasurer, and the Board of Supervisors of Elections for Anne Arundel County. Duckworth requested the convening of a three-judge district court, with the aim of having the court declare unconstitutional Maryland Senate Bill 805, which enacted the Congressional Districting Plan of 2002. On June 24, 2002, plaintiff filed a first amended complaint, substituting Secretary of State John Willis as a defendant in place of Kropp. He also filed a motion for a preliminary injunction, but did not support the request for a preliminary injunction with a memorandum of law as required by the court's local rules. Defendants have filed a motion to dismiss or, in the alternative, for summary judgment, which plaintiff has opposed. I have

FILED ____ ENTERED
____ LODGED ____ RECEIVED

AUG 0 5 2002

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY ____
DEPUTY



given careful attention to the parties' memoranda and a hearing is not needed. *See* Local R.

105.6. For the following reasons, under the unique circumstances of this case, I am persuaded

that the amended complaint is insufficient and is beyond rehabilitation, as it demonstrably

fails to assert any substantial federal constitutional claim. Accordingly, I shall reject

plaintiff's request that a three-judge court be convened and, treating defendants' motion as

a motion to dismiss, I shall grant defendants' motion and dismiss this case with prejudice.

I.

A complaint should not be dismissed for failure to state a claim under Federal Rule

of Civil Procedure 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no

set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson*, 355

U.S. 41, 45-46 (1957); *see Warth v. Seldin*, 422 U.S. 490, 501 (1975); *Scheuer v. Rhodes*,

416 U.S. 232, 236 (1974). Motions to dismiss for failure to state a claim are "granted

sparingly and with caution in order to make certain that plaintiff is not improperly denied a

right to have his claim adjudicated on the merits." 5A Charles A. Wright & Arthur R. Miller,

FEDERAL PRACTICE & PROCEDURE, CIVIL 2D § 1349 at 192-93 (1990).

Federal Rule of Civil Procedure 8(a)(2) requires only that a complaint include "a short

and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P.

8(a). A claimant is not required to "set out in detail the facts upon which he bases his claim"

so long as the claim "will give the defendant fair notice of what the plaintiff's claim is and

the grounds upon which it rests." *Conley*, 355 U.S. at 47. Moreover, although all well-

pleaded factual allegations are assumed to be true and are viewed in the light most favorable

to the plaintiff, *Jenkins v. McKeithen*, 395 U.S. 411, 421-22 (1969), allegations of legal conclusions need not be credited. *Edwards v. City of Goldsboro,* 178 F.3d 231, 244 (4th Cir. 1999).

Federal courts will grant a motion to dismiss a political gerrymandering claim where the complaint fails to state a claim. *See, e.g., Smith v. Boyle*, 144 F.3d 1060 (7th Cir. 1998) (political gerrymandering claim in respect to judicial elections); *O'Lear v. Miller*, 2002 WL 1052046 at *6 (E.D. Mich. May 24, 2002) (granting motion to dismiss political gerrymandering claim, stating "[m]indful of *Bandemer's* murky nature and the relatively lenient standard for surviving a motion to dismiss, we will dismiss plaintiffs' [gerrymandering] claim without prejudice") (three-judge court); *O'Lear v. Miller*, 2002 WL 1212212 (E.D. Mich. June 5, 2002)(dismissing, *sua sponte*, second amended complaint purporting to allege political gerrymandering claim); *Veith v. Commonwealth of Pennsylvania*, 188 F.Supp.2d 532, 545-47 (M.D.Pa. 2002) (dismissing political gerrymandering claim)(three-judge court); *Badham v. Fong Eu*, 694 F.Supp. 664, 670 (N.D.Cal. 1988)(same)(three-judge court), *aff'd*, 488 U.S. 1024 (1989).

## II.

Viewing the facts in the light most favorable to Duckworth and taking his well-pleaded allegations as true, the following constitutes the factual basis for this suit.

The 2000 Census revealed the official population of Maryland as 5,296,486. *First Am. Compl.* ¶ 10. The results of the census were duly reported to the Governor of Maryland for use in the apportionment of Congressional districts as required by law. *See* 13 U.S.C. §

-3-

141(c). *Id.* The 435 seats in the United States House of Representatives were allocated among the states on the basis of population. Maryland was assigned eight seats, the same number assigned as a result of the preceding census in 1990. *Id.* ¶ 11. Thereafter, the Governor established a five-member Redistricting Advisory Committee to formulate the 2002 redistricting plan. *Id.* ¶ 13. The resulting redistricting proposal split Anne Arundel County so that the county lies in part of four congressional districts, as it did after the 1990 census. *First Am. Compl.*, Attach. (Sara Marsh, *New Map Splits County in Four,* THE CAPITAL, Feb. 9, 2002, at A1, A10)). Duckworth alleges that such a splitting of Anne Arundel County results in the conversion of the voters in the county, the State's fourth most populous county, "into a minority voice in each of the four newly created congressional districts, thereby cancelling [sic] out or minimizing their voting strength." *Id.* ¶ 16. Moreover, the splitting of Anne Arundel County results in two incumbent Republican members of Congress running against each other. *Id.* ¶ 15.

In any event, on February 8, 2002, the Governor proposed the instant plan for reapportionment of Congressional districts. The plan was introduced in the Maryland General Assembly as Senate Bill 805 on February 11, 2002. The bill passed both houses as an emergency bill on April 4, 2002, and was signed into law by the Governor as Chapter 340, Laws of Maryland 2002 on May 6, 2002.

Meanwhile, several parties filed legal challenges to the Maryland state legislative redistricting plan adopted by the Maryland Legislature and, on June 11, 2002, the Court of Appeals of Maryland struck down the State legislative redistricting map. *In the matter of*

*Legislative Districting of the Senate*, 2002 Md. Lexis 348 (June 11, 2002). One week later, on June 18, 2002, Duckworth filed the present challenge to the reapportionment of Congressional districts as "violative of the constitutional rights of plaintiff under Article 1, Section 2, the First Amendment and the Equal Protection Clause of the Fourteenth Amendment." *Compl.* ¶ 37. On June 24, 2002, plaintiff filed a first amended complaint. Thereafter, defendants timely filed the pending motion seeking dismissal of all claims.

III.

Plaintiff requested a convening of a three-judge district court pursuant to 28 U.S.C. § 2284(a), "as this action challenges the constitutional apportionment of congressional districts in the State of Maryland." *First Am. Compl.* ¶ 6. "A district court of three judges shall be convened when otherwise required by Act of Congress, or when an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body." 28 U.S.C. § 2284(a). In rare instances, despite the command of § 2284(a), a single district judge is authorized to consider and grant a preliminary motion to dismiss an apportionment challenge. That is, a single district judge may dismiss a complaint otherwise subject to § 2284(a) if the judge determines that the constitutional claims are insubstantial in that they are "obviously without merit or clearly determined by previous case law." *Armour v. State of Ohio*, 925 F.2d 987, 989 (6th Cir. 1991) (*en banc*)(citing, *inter alia*, *Simkins v. Gressette*, 631 F.2d 287 (4th Cir. 1980)). *Cf. Goosby v. Osser*, 409 U.S. 512, 518 (1973) (stating that the convening of a three-judge

district court is not required when the plaintiffs' "constitutional attack" on state government action is "insubstantial").

Specifically, the Fourth Circuit has explained, in a case arising under an earlier version of the three-judge court statute:

> If it appears to the single district judge, . . . that the complaint does not state a substantial claim for injunctive relief, he need not request the convening of a three-judge court. Insubstantiality in the claim may appear because of absence of federal jurisdiction, lack of substantive merit in the constitutional claim, or because injunctive relief is otherwise unavailable. Such insubstantiality may be evident from the frivolous nature of the claim or from previous decisions of the Supreme Court which require an adverse answer. When it thus appears that there is no substantial question for a three-judge court to answer, dismissal of the claim for injunctive relief by the single district judge is consistent with the purpose of the three-judge statutes, and it avoids the waste and delay inherent in a cumbersome procedure.

*Maryland Citizens for a Representative Gen. Assembly v. Governor of Maryland*, 429 F.2d 606, 611 (4th Cir. 1970) (footnotes omitted); *see Simkins v. Gressette*, 631 F.2d at 295.

In *Maryland Citizens for a Representative Gen. Assembly*, the Fourth Circuit addressed an appeal from the dismissal by a single federal district judge of a complaint seeking "(1) a declaration that the statute apportioning Maryland's General Assembly is unconstitutional, (2) an injunction restraining Maryland's election officials from conducting the 1970 primary and general elections for the General Assembly under that statute, and (3) a directive to Maryland to conduct the 1970 elections in accordance with a new, constitutional reapportionment plan." *Id.* at 607. The complaint also sought the convening of a three-judge court. *Id.* The Fourth Circuit determined that the facts presented in the case before it were analogous to those present in *Chavis v. Whitcomb,* 403 U.S. 124 (1971).

-6-

Accordingly, applying the above-described criteria for determining when a single judge may adjudicate a preliminary motion in such a case, the Court held that "[t]he Supreme Court's recent action in *Chavis* makes clear the unavailability of injunctive relief here. It established the insubstantiality of the claim and warranted its dismissal by the single district judge without requesting the convening of a three-judge district court." *Id.* at 611.

In *Simkins*, 11 black citizens and registered voters of South Carolina filed an action against various South Carolina officials and against the chairmen of the State Democratic and Republican parties, alleging "that South Carolina's present senate reapportionment plan dilutes their vote in violation of the First, Thirteenth, Fourteenth, and Fifteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1971, 1973, and 1983." *Simkins*, 631 F.2d at 289. The plaintiffs also sought the convening of a three-judge court. *Id.* Plaintiffs filed their complaint two days before the opening of the filing period for candidates seeking nomination through the State primaries; they sought a temporary restraining order to prevent the opening of the filing period until a three-judge court could be convened. *Id.* The court denied the motion. *Id.* Defendants then filed a motion to dismiss, and a single district judge granted the motion and dismissed the complaint, relying primarily on *Maryland Citizens. Id.* at 289, 290.

The district court found the plaintiffs' complaint to be insubstantial because "injunctive relief would not be available to the plaintiffs primarily because of their delay in filing [the] action and because of the impending 1980 census that would likely require reapportionment." *Id.* at 290. The district court also determined that a three-judge court was

unnecessary in light of the Supreme Court's decision in *City of Mobile v. Bolden*, 446 U.S.
55 (1980), and the district court's own opinion in *McCollum v. West*, No. 71-1211 (D.S.C.
April 7, 1972) (unpublished)--the case which struck down the reapportionment plan after the
1970 census and forced the 1972 reapportionment plan that was under attack in *Simkins*. *Id.*
at 289, 290. The Fourth Circuit affirmed the dismissal of the case by the single district judge,
reasoning that the "insubstantiality" of plaintiffs' claims was evident for the following three
reasons: (1) a prior decision of the district court in a separate case --*McCollum v. West*--had
rejected the same claims as to the existing districts; (2) a Supreme Court decision had
rejected challenges similar to plaintiffs' claims, although the case involved a different state;
and, (3) equitable relief was unavailable because plaintiffs had waited too long to challenge
the reapportionment. *Simkins*, 631 F.2d at 290, 291-93, 294.

In the case at bar, defendants contend that Duckworth's constitutional claims are
insubstantial under the reasoning of the Fourth Circuit set forth above. Specifically,
defendants contend that the first amended complaint should be dismissed on any one or more
of the following grounds by a single district judge or by a three-judge court: (1) Duckworth's
ostensible claims are insubstantial "because identical claims have been [previously] rejected
by [this court] and the Supreme Court"; (2) Eleventh Amendment immunity; and (3)
injunctive relief is barred by laches, i.e., Duckworth's claims "were asserted too close to
impending elections and any injunction would unduly disrupt the electoral process." *Dfs.'
Mem. in Support of Mot. to Dismiss*, at 6. Duckworth, focusing predominantly on his claim

of unconstitutional gerrymandering, contends that he has alleged sufficient facts to state cognizable claims.

As I explain herein, I agree with defendants that a three-judge panel is not necessary because all of plaintiff's claims are insubstantial. In particular, the claims are insubstantial and frivolous, as identical claims have been rejected by a prior three-judge panel of this court, in rulings which the Supreme Court affirmed. Accordingly, I need not and do not reach defendants' arguments based on sovereign immunity or laches. I explain.

IV.

A.

Preliminarily, it is undisputed that the first amended complaint draws its substance from the very same facts and bald legal conclusions set forth in a complaint prepared and filed in 1991 by plaintiff's attorney to challenge the previous Congressional reapportionment in Maryland. *See Defs.' Ex.* 2 (Complaint in *Anne Arundel County Republican Cent. Comm., et al. v. The State Admin. Bd. of Election Laws, et al.,* Civil Action No. S-91-3200(D.Md.)) (hereinafter *Defs.' Ex.* 2 (1991 Complaint)). That challenge was ultimately rejected by a three-judge court. *See Anne Arundel County Republican Cent. Comm. v. The State Administrative Board of Elections*, 781 F. Supp. 394 (D.Md. 1991), *aff'd*, 504 U.S. 938 (1992)(mem.). Remarkably, 37 of the 40 numbered paragraphs in the first amended complaint in the case at bar contain allegations and arguments taken *verbatim* from the complaint filed in 1991 in *Anne Arundel County Republican Central Committee*.

As mentioned above, in *Anne Arundel County Republican Central Committee*, a three-judge panel of this court, with one judge dissenting in part, granted defendants' motion to dismiss or, in the alternative, for summary judgment, and in doing so, the court rejected all of the arguments now repeated by Duckworth. The plaintiffs in *Anne Arundel County Republican Central Committee* included citizens of Anne Arundel County and members of both the Republican and Democratic party central committees of Anne Arundel County. Plaintiffs objected to the Congressional redistricting plan approved by the Maryland General Assembly on October 22, 1991, following the 1990 Census. *Id.* at 394. The plaintiffs alleged "that the Maryland General Assembly failed to make a good-faith effort to achieve numerical equality among the eight new congressional districts, and, in fact that [the plan] was adopted with the discriminatory intent to 'deprive the plaintiffs of an opportunity to effectively participate in the political process,' in violation of their rights under Article 1, §2 of the United States Constitution." *Id.* at 395. The plaintiffs also brought a gerrymandering claim. *Id.*

The court emphatically rejected all of plaintiffs' claims. As for the claim based on alleged violations of Article 1, §2 of the federal constitution, the court held that the reapportioned congressional districts, which had an overall population variance of 10 people, satisfied the "one person, one vote" requirement. *Id.* at 397-99. Moreover, the court held, "Article 1, §2 does not prohibit a state from taking into account political factors in redistricting and this court defers to the Maryland Legislature and State policies, so long as they are consistent with constitutional norms, even if they require small differences in the

population of congressional districts." *Id.* at 398-99. The court further held that the plaintiffs

failed to establish a claim of political gerrymandering under the principles set forth in *Davis*

*v. Bandemer*, 478 U.S. 109 (1986). *Id.* at 399. The court also noted that dividing Anne

Arundel County among four Congressional districts "does not violate any federal

constitutional provision, including the mandate of Art. I, §2, to give full effect to the voice

of the people." *Id.* at 401. Finally, the court determined that there was no First Amendment

violation. *Id.*

The court ultimately held that the constitutional claims alleged in 1991 were merely

"a political setback, but not a violation . . . of federal constitutional rights." *Anne Arundel*

*County Republican Cent. Comm.*, 781 F. Supp. at 401. The Supreme Court summarily

affirmed the court's judgment. 504 U.S. 938 (1992)(mem.). Although a summary affirmance

does not bind the Supreme Court in future cases, a summary affirmance binds lower federal

courts, preventing "lower courts from coming to opposite conclusions on the precise issues

present and necessarily decided by those actions." *Mandel v. Bradley,* 432 U.S. 173, 176

(1977).

## B.

Careful scrutiny of Duckworth's seemingly whimsical challenge to the contemporary

districting plan adopted by the Maryland Legislature shows that the challenge plainly fails

as constitutionally insubstantial based on extant Supreme Court and Fourth Circuit precedent.

-11-

### *Plaintiff's "One Person, One Vote" Claim is Insubstantial*

Like the plaintiffs in 1991, Duckworth asserts that the requirement of population

equality--the one person, one vote requirement--demanded by Article 1, § 2 of the

Constitution, has not been satisfied. *First Am. Compl.* ¶ 32. On the contrary, however, as

defendants persuasively demonstrate, the State's 2002 Congressional Districting Plan comes

closer to an ideal of population equality than the plan upheld in 1991, and, under immutable

laws of mathematics, the minimal population variance (of which I take judicial notice) built

into the 2002 plan could not be avoided.

> As the court explained in *Anne Arundel County Republican Central Committee*:
>
> Article I, §2 of the United States Constitution provides that the members of the
> House of Representatives will be chosen "by the People of the several States,"
> with equal representation for equal numbers of people. *Wesberry v. Sanders*,
> 367 U.S. 1, 7-9 (1963). This Constitutional mandate "means that as nearly as
> is practicable one man's vote in a congressional election is to be worth as
> much as another's." *Id.* Consequently, congressional districts are to be
> apportioned to achieve "precise mathematical equality." *Kirpatrick v. Preisler*,
> 394 U.S. 526, 530-31 (1969).

*Anne Arundel County Republican Cent. Comm.,* 781 F. Supp. at 395-96. To establish a

violation of Article I's "one person, one vote" requirement, plaintiff must "bear the burden

of proving that 'the population differences among districts could have been reduced or

eliminated altogether by a good-faith effort to draw districts of equal population'" and,

therefore, were not "unavoidable." *Id.* at 396 (quoting *Karcher v. Daggett*, 462 U.S. 526,

530-31 (1983)). Only if plaintiff makes that threshold showing does the burden shift to the

defendants to show that "each significant variance between districts was necessary to achieve

some legitimate goal." *Id.* (internal quotation marks omitted) (quoting *Karcher*, 462 U.S. at 731).

Here, plaintiff has failed to allege facts sufficient to satisfy his pleading burden. In contrast to the 1991 complaint, which alleged "the failure of the General Assembly to consider or adopt other districting plans which were available to it and which resulted in less deviation from mathematical equality," including a proposed alternative plan in House Bill 22 (*Defs.' Ex.* 2 (1991 Complaint ¶ 68, attaching copy of House Bill 22 as exhibit to complaint)), Duckworth's revised version of that paragraph deletes the allegation that there was any other alternative plan that would have resulted in less deviation. *See First Am. Compl.* ¶ 34. The first amended complaint states that "[t]he absence of good-faith effort and the intentional discriminatory intent underlying Bill 805 are further evidence [sic] by the failure of the General Assembly to consider or adopt other districting plans which were available to it, and which were not drawn on the basis of partisan interest." *Id.* Whereas, in 1991 the court cited the existence of proposed alternative plan, House Bill 22, which had a smaller deviation from absolute equality, as evidence that variances in the State's plan were not unavoidable, *Anne Arundel County Republican Cent. Comm.*, 781 F. Supp. at 396, Duckworth makes no such allegation. Indeed, judicially noticeable facts demonstrate as a matter of law that there is no evidence from which a court could conclude that the State's 2002 Congressional plan contains any population variance that could have been avoided.

In other words, it is clear as a matter of law that Maryland's 2002 Congressional Districting Plan is the result of good faith efforts to achieve population equality between

Congressional districts to the extent possible, given the reality that absolute equality of population was mathematically impossible. According to the 2000 Census, the population of Maryland was 5,296,486. *Aro Decl.* ¶ 2. Based on that population, Maryland is entitled to elect eight members to the House of Representatives, as it was in respect to the 1990 Census. Of course, the State's population must be equally apportioned among those eight districts. *Id.* ¶ 3. Yet, the State's population of 5,296,486 is not evenly divisible by eight. *Id.* ¶ 4. Dividing 5,296,486 by eight yields a quotient of 662,060 people with a remainder of six people, for a theoretical "ideal district population of 662,060.75." *Id.*

Because the State's population does not divide evenly into eight districts of equal population and the "ideal" district population is not a whole number, it is impossible to reapportion Maryland's Congressional districts without some variance from perfect population equality and some variance between district populations. *Id.* ¶ 5. If, for example, the "ideal" district population of 662,060.75 is rounded down to the whole number 662,060, the smallest absolute variance achievable for all eight districts can be determined by multiplying .75 by 8, which equals 6. *Id.* If the "ideal" district population is rounded up from 662,060.75 to 662,061, the smallest absolute variance achievable for all 8 districts is .25 multiplied by 8 which equals 2. *Id.* As the theoretical ideal district population of 662,060.75 is not a whole number, either 662,060 or 662,061 could reasonably be used as the whole number that approximates the ideal. *Cf. Rodriquez v. Pataki*, No. 02 Civ. 618(RMB), 2002 WL 1058054 at *5 (May 24, 2002) (explaining that the Special Master's proposed redistricting plan "adheres to the principles of 'one person, one vote'" where the ideal district

-14-

population was 654,360.6 and districts having a population of either 654,360 or 654,361 had "zero deviation" from the ideal).

Under Maryland's Congressional Districting Plan, five districts, the 2nd, 5th, 6th, 7th, and 8th, have an equal population of 662, 060 each, with no variance from each other or from the ideal population. The three remaining districts, the 1st, 3rd, and 4th, have a population of 662,062 each, resulting in an absolute overall population variance of 2 persons for the State's plan, which amounts to 0.0003%. *Aro Decl.* ¶ 7.

Any further reduction of population variance was not possible due to the dictates of arithmetic, as well as the limitations of available Census data and the requirements of the redistricting process. ¶ 8. The smallest unit of geographic area for which the Census provides a population count is the "census block." *Id.* ¶ 9. The population of census blocks may vary anywhere from zero to several hundred or more, depending on the result of the Census count for each block. *Id.* In preparing the Maryland Congressional Districting Plan, districts were "built," according to the method the General Assembly has used for past Congressional reapportionments, by starting with the pre-existing district boundaries, determining how much population a district needed to gain or lose, and reassigning precincts or census blocks, as appropriate. *Id.* ¶ 10.

Adjustment of district population to achieve equality is accomplished by determining whether any precincts or census blocks contiguous with the district boundaries have the correct population needed to make the necessary adjustment. *Id.* ¶ 11. This practical reality limits the State's ability not only to find census blocks with the precise population needed,

but also to combine them in such a way that will achieve the target population exactly. The process often involves splitting precincts--the basic building blocks for any redistricting plan--and then trading census blocks located within those precincts back and forth between districts to achieve the required population balance. *Id.* Even if a census block with the appropriate population is located contiguous to the district boundary, it may not be possible to reassign that census block to the adjacent district if it is located in a district that itself needs the census block's population to achieve sufficient population. *Id.* ¶ 12. Due to limitations of widely variable population of census blocks, the location of suitable census blocks, and the configuration of districts as they are constructed from prior districts, it is sometimes impossible to obtain the necessary combinations of population within available census blocks to achieve perfect population equality among districts. *Id.* ¶ 13. Given the mathematical realities and these practical limitations of the redistricting process, the variance of 2 between the most and least populous districts in the State's plan was unavoidable. Consequently, it is clear that plaintiff's "one person, one vote" claim is frivolous.

Oddly, Duckworth's principal opposition to the asserted insubstantial nature of the claim under Article I is his citation to ¶ 35 of the first amended complaint. He argues that "paragraph 35 of plaintiff's complaint alleges that Bill 805 fails to make any good faith effort to achieve precise mathematical equality among the congressional district [sic] and adopt a plan of districting unrelated to fair representation in government, purposely drawn in accordance with gerrymandering principles." *Pl.'s Opp.*, at 19. However, paragraph 35 does

not address "good faith effort;" rather, paragraph 34 does. Paragraph 35 discusses employing

reasonable and/or neutral criteria in districting.[1]

Duckworth further argues:

[T]wo other plans with . . . population [variances equal to the plan at issue] were submitted via amendment but rejected. The plain fact of the matter is while these two [proposals] were less than desirable from plaintiff's perspective, they did prevent two incumbent congressman [sic] from running against one another. And clearly, without citation, the Supreme Court has said one of the reasons for which population deviation may be less than equal is an effort to avoid incumbent congressman from running against one another. There [sic] rational and reasoning for this is very simple. Congressman [sic] are the people's representatives and if a plan is submitted which respects two congressional members it also respects the people which they represent.

*Id.* (emphasis added).

This argument, to the extent it is comprehensible at all, is unavailing. The fact that two

incumbent congressmen now have to run against each other does not become a factor in the

analysis until plaintiff has satisfied his initial burden of alleging facts pursuant to which a

smaller population variance can be achieved. This he has not and, as a matter of law, cannot

---

[1]In paragraph 35 of the first amended complaint (mimicking the 1991 complaint), Duckworth has listed the "neutral criteria" identified in *Karcher* as "legislative policies that might justify some variance among the populations of the State's various congressional districts." *See Veith*, 195 F. Supp. 2d at 677 (citing *Karcher*, 462 U.S. at 741). As discussed in text, however, the neutral criteria are relevant to the second prong of the *Karcher* test: the state's justification for a variance. As a matter of law, Duckworth's factual allegations, as informed by indisputable, judicially-noticed facts, and in the light of the prior decision of the three-judge court, are insufficient state a cognizable claim under Article 1, § 2 of the Federal Constitution.

Paragraph 35 also alludes to the Maryland Constitution, Art. III, §4, which states that "[e]ach legislative district shall consist of adjoining territory, be compact in form, and of substantially equal population," and "[d]ue regard shall be given to natural boundaries and the boundaries of political subdivisions." However, while those requirements apply to reapportionment of districts for the Maryland General Assembly, Maryland law does not require that those criteria be used in Congressional redistricting.

do. As stated *supra*, if plaintiff could meet his burden, then defendants would have the burden of proving that the population deviation was "necessary to achieve some legitimate goal." *Karcher*, 462 U.S. at 731. The *Karcher* Court gave examples of "legislative policies that might justify some variance among the populations of the State's various congressional districts," one of which is whether the plan avoids "contests between incumbent Representatives." *Veith*, 195 F. Supp. 2d at 677 (citing *Karcher*, 462 U.S. at 741). Accordingly, it is irrelevant that the current districting plan requires two incumbent representatives to run against each other, as it is evident that plaintiff has not met his burden to plead a colorable violation.

Again, as explained *supra*, the State's plan contains no "significant variance" between districts for which justification might be required under *Karcher*. This is especially so when the minuscule variance here is compared to far greater variances that have withstood Supreme Court scrutiny.[2] Moreover, there is clearly no independent obligation to justify why two incumbent Congressmen reside within the same district under the reapportionment plan.

---

[2] Since the court's decision in *Anne Arundel County Republican Central Committee*, *supra*, for example, the Supreme Court has upheld as valid under Article I a court-ordered Congressional redistricting plan in which district populations vary from one another by as much as 2,047 people, even though "Court-ordered districts are held to higher standards of population equality" than those adopted by State legislators. *Abrams v. Johnson*, 521 U.S. 74, 98-101 (1997) (affirming a plan ordered by a three-judge district court in *Johnson v. Miller*, 922 F. Supp. 1556, 1571-72 (S.D. Ga. 1995)). By comparison, the absolute overall population variance between districts approved in *Abrams* was more than a thousand times the size of the absolute overall variance of 2 in Maryland's 2002 plan. More recently, a three-judge district court found that a court-ordered Congressional plan achieved "virtual equality" with an overall population variance five times greater than Maryland's plan; a variance of 10 persons compared to Maryland's 2. *See Smith v. Clark*, 189 F. Supp. 2d 529, 539 (S.D. Miss. 2002). Thus, the minor variances in Maryland's plan can hardly be deemed significant.

*See Republican Party of Virginia v. Wilder*, 774 F. Supp. 400 (W.D. Va. 1991) (observing that no court has adopted the view that "pairing of a disproportionate number of minority party incumbents is a constitutional violation"). Accordingly, in light of *Anne Arundel County Republican Central Committee* and the controlling legal principles, plaintiff's Article 1 claim is insubstantial and must be dismissed.

### *Plaintiff's Political Gerrymandering Claim is Insubstantial*

Like the 1991 plaintiffs, Duckworth challenges the reapportionment plan on the ground that the plan is unconstitutional under *Davis v. Bandemer*, 478 U.S. 109 (1986), in that it contains a politically gerrymandered district. *First Am. Compl.* at ¶¶ 15, 26, 27, 33, 36, 38, 39. Duckworth's gerrymandering claim, however, is insubstantial as Duckworth has repeated, practically verbatim, the same factual assertions, with the same alleged injury, that the court found insufficient to establish a cognizable political gerrymandering claim in *Anne Arundel County Republican Central Committee. See* 781 F.Supp. at 401. *Compare First Am. Compl.* ¶¶ 15, 26, 27, 33, 36, 38, 39 *with* Exhibit 2, 1991 *Compl.* ¶¶ 50, 60, 61, 67, 70, 72,73. Indeed, the only substantive difference between Duckworth's present challenge and the 1991 case is that the prior case included plaintiffs representing both the Democratic and Republican parties, *see Anne Arundel County Republican Cent. Comm.*, 781 F.Supp. at 399. That aside, all other differences between the claim in the present action and the claims asserted in the previous case are no more than minor, cosmetic changes Duckworth has made to perpetuate litigation on issues already finally resolved.

For example, the first amended complaint, using identical language as that contained

in the 1991 complaint, states that Bill 805

> creates districts which are not contiguous or compact; divides counties into
> unnecessary fragments; fails to recognize communities of common social and
> economic interest; fails to recognize recent shifts in population; fails to
> preserve the core constituencies of preexisting districts; unnecessarily pits
> incumbent congressmen against one another; fails to recognize the rights of
> political groups of associations to effectively influence and participate in the
> political process; and [intentionally], arbitrarily and invidiously debases and
> dilutes the votes of the residents of Anne Arundel County by the unnecessary
> splitting of the County into four Congressional districts [to intentionally
> arrange the elective process to prevent the people of Anne Arundel County
> from electing Republican Congressmen.]

*Compare First Am. Compl.* ¶ 15 *with* Exhibit 2, (1991 *Compl.* ¶50). Duckworth's assertion

that "[Bill 805] was adopted by exclusive legislative process, and the district lines as drawn

are reflective of its discriminatory, arbitrary, and with invidious intent to deprive plaintiff of

an opportunity to effectively participate in the political process" is likewise identical to the

1991 complaint. *Compare First Am. Compl.* ¶ 33 *with Defs.' Ex.* 2 (1991 Complaint ¶¶ 67).

In addition, Duckworth's detailed description of the negative effect of Bill 805 is identical

to that contained in the 1991 complaint, with the exception that the Bill's name has been

changed:

> Certain of the congressional districts created by [Bill 805] are laboriously and
> elaborately twisted, elongated and contrived to such an extreme and excessive
> degree as to make their configuration constitute a further deprivation to the
> residents affected thereby of the right to an equal and meaningful vote in
> congressional elections, and were devised for partisan purposes and upon
> motivations which establish the absence of good faith, and constitute an insult
> to the residents affected thereby . . . . Similarly, and with the same effect,
> certain of the districts created by [Bill 805] totally evade compactness and
> divide certain counties into an unnecessarily excessive number of fragments,

fail to recognize communities of common social and economic interests, and
force incumbent congressmen to run against one another.

*Compare First Am. Compl.* ¶ 36 *with Defs.' Ex.* 2 (1991 Complaint ¶ 70).

Similarly, Duckworth's alleged injury borrows almost word-for-word from the 1991
complaint: "The adoption of [Bill 805] has and will continue to deny plaintiff['s] right to
vote and to effectively influence the political process and is further evidence of an effective
denial to a minority of voters of a fair chance to influence the political process." *Compare
First Am. Compl.* ¶ 38 *with Defs.' Ex.* 2 (1991 Complaint ¶ 72). Duckworth further alleges,
again using language identical to that contained in the 1991 complaint:

> The adoption of [Bill 805] constitutes an arrangement of the electoral system
> in a manner which will consistently degrade plaintiff['s] individual
> [participatory] and collective influence on the political process, as a whole, by
> a cynical and [massed] [intentional,] arbitrary and invidious legislative action
> which at a maximum paid lip service to any constitutional notion of fair and
> effective representation in government without regard to the will of the voters,
> but was in furtherance of the [intentional,]deliberate and arbitrary motives set
> in motion by a [Democrat Governor and Democrat-controlled General
> Assembly] to create new safe seats and preserve and perpetuate old ones.

*Compare First Am. Compl.* ¶ 39 *with Defs.' Ex.* 2 (1991 Complaint ¶ 73).

Thus, in comparing the two sets of allegations, it is unmistakably evident that the
thrust of Duckworth's gerrymandering claim is the same as that in 1991 complaint-- that
"[t]he unnecessary splitting of Anne Arundel County has resulted in the conversion of the
voters in the State's fourth most populous county into a minority voice in each of the four
newly created congressional district[s], thereby cancelling [sic] out or minimizing their
voting strength." *First Am. Compl.* ¶ 16; *Defs.' Ex.* 2 (1991 Complaint) ¶ 51. As the court

-21-

stated in *Anne Arundel County Republican Central Committee, supra* "at the heart of plaintiffs' argument is that Anne Arundel County, the State's fourth most populous county and formerly part of the State's Fourth Congressional District, has been divided by H.B. 10 among four separate congressional districts, thus 'diluting' the votes of the residents." *Id.* at 395. In *Anne Arundel County Republican Central Committee,* the court determined that the facts alleged by plaintiffs then, the very facts repeated by Duckworth now, failed to establish "any discriminatory vote dilution" that might give rise to a political gerrymandering claim under *Davis v. Bandemer*, because nothing "indicates that their vote will necessarily be any less powerful in any of the four congressional districts in which they will now reside," and "[n]othing prevents the plaintiffs from joining the local organizations of the political parties of their choice and having whatever power they had previously to influence the political process." *Anne Arundel County Republican Cent. Comm.*, 781 F.Supp. at 401. In rejecting the claim in 1991, the court held that dividing Anne Arundel County residents among four Congressional districts "does not violate any federal constitutional provision, including the mandate of Art. I, §2, to give full effect to the voice of the 'people.'" *Anne Arundel County Republican Cent. Comm.*, 781 F. Supp. at 401. Accordingly, because the court previously adjudicated a claim that in every material respect is identical to Duckworth's present claims, Duckworth's present claim is frivolous and thus insubstantial.

Duckworth does not dispute, and cannot dispute, that the first amended complaint and the 1991 complaint are identical. Instead, Duckworth posits that the current claim is not insubstantial because it attacks a different congressional reapportionment plan that resulted

-22-

from a subsequent decennial census. Duckworth provides no authority, however, for this

assertion. Nor does this purported distinction survive scrutiny under *Simkins*, *supra,* 631 F.2d

at 293.

Duckworth argues that *Simkins* somehow is inapposite because his claim does not

involve a repeated challenge to the same plan and because the challenge in *Simkins* was not

timely brought. Duckworth's attempts to distinguish *Simkins* are unavailing. In *Simkins,* as

discussed *supra,* the Fourth Circuit affirmed the district court's judgment and determined that

"insubstantiality" was correctly found and the complaint correctly dismissed for several

reasons, one of which was the prior decision of the district court in a separate case --

*McCollum v. West*-- which rejected the same claims as to the existing districts. Concluding

that these claims were insubstantial, the Fourth Circuit explained:

> [T]he substantiality of these claims was adjudicated adversely to plaintiffs'
> claims by the *McCollum* court . . . . Although technically *McCollum* may not
> be res judicata, nor may these plaintiffs be estopped by its judgment, we find
> very persuasive the decision in *McCollum*, for the defendants have had the
> identical issues presented here decided in favor their favor. . . . Thus, that
> decision is more persuasive than it might otherwise be."

*Id.* at 293. The Court further explained that it placed substantial reliance on the prior case

for its decision "for the defendants or their predecessors in interest have had to defend

against the same claims twice, and in neither case have the plaintiffs offered to prove any

facts other than those we have mentioned in our opinion. *Id.*

Similarly here, in 1991, the court resolved the identical issues raised by Duckworth.

Thus, the current defendants are defending against the same claims for a second time. That

the two districting plans are not precisely identical is of no moment; as discussed *supra*, the

gravamen of Duckworth's gerrymandering claim, as with the 1991 plaintiffs, *is the alleged*

*unfairness inhering in the division of Anne Arundel County into four congressional districts*.

This division of Anne Arundel County is not a new or innovative facet of the 2002 plan. *See*

*First Am. Compl.* ¶ 36 (citing Sara Marsh, *New Map Splits County in Four,* THE CAPITAL,

Feb. 9, 2002, at A1, A10 (noting that as a result of the revised plan "Ann Arundel County

would remain divided among four congressional districts. . . .[splitting] the county among

the 1st, 2nd, 3rd and 5th congressional districts-- the same districts the county has been split

among for the past decade")). As Duckworth fails to allude to any facts that suggest his

claims are based on any particular provision in the 2002 plan, he cannot argue now that his

claims hinge on a distinction between the plan at issue in the 1991 case and Bill 805.

In a final attempt to breathe life into his claims, Duckworth suggests that various

dissenting opinions substantiate his claims regarding the 2002 plan. Duckworth cites Judge

Smalkin's partial dissent in *Marylanders for Fair Representation, Inc. v. Schaefer,* 849

F.Supp. 1022 (D.Md. 1994) (three-judge court) (a constitutional and statutory challenge to

the Maryland legislative redistricting plan occasioned by the 1990 Census); Judge

Niemeyer's dissent in *Anne Arundel County Republican Central Committee supra,* and

Justice Harlan's dissent in *Wills v. Rockefeller,* 394 U.S. 542 (1941), as supporting his

contention that the Third Congressional District is a politically gerrymandered district. Even

if I were to agree with Duckworth's interpretation of the excerpts he provides from these

various opinions, however, which I do not, these excerpts are taken from dissenting opinions

-24-

and, plainly, are not controlling.

In any event, ignoring Duckworth's heavy reliance in the amended complaint on bald legal conclusions (in contrast to well-pleaded facts, which are accepted as true), he has plainly failed to state a cognizable claim. To establish a political gerrymandering claim, plaintiff must allege facts supportive of the existence of two elements: (1) "intentional discrimination against an identifiable political group" and (2) "actual discriminatory effect on that group," i.e., denial of "its chance to effectively influence the political process." *Bandemer*, 478 U.S. at 127. While the standard for alleging and proving the first element is "relatively undemanding," *Marylanders for Fair Representation, Inc.*, 849 F.Supp. at 1038 (citations omitted); *see Bandemer*, 478 U.S. at 129 ("As long as redistricting is done by a legislature, it should not be very difficult to prove that the likely consequences of the reapportionment were intended."), to allege facts which, if believed, would tend to prove the second element of "discriminatory effect" is not an easy task, nor was it intended to be so by the Supreme Court. *See O'Lear*, 2002 WL 1052046 at *4 n.3 (observing that "[t]he plaintiffs in this case have not alleged that they have been shut out of the process or that the challenged congressional redistricting plan is one from which they cannot recover or substantially improve upon . . . " and noting that the "'no chance of doing better' requirement possibly reflects an effort [by the Supreme Court plurality in *Bandemer*] to keep federal courts out of political disputes that are amenable to political solutions . . . .").

Thus, to state a cognizable claim of illegal gerrymandering, Duckworth must allege facts suggesting he has a means to prove that Republican voters have "essentially been shut

out of the political process." *Marylanders for Fair Representation*, 849 F.Supp. at 1049

(quoting *Bandemer*, 478 U.S. at 139). *See Republican Party of North Carolina v. Martin*, 980

F.2d 943, 955-58 (4th Cir. 1992) (noting that to allege a cognizable unlawful gerrymandering

claim "a plaintiff must complain that an actual or projected history of disproportionate results

exists" and summarizing the rich details contained in the complaint in that case, involving

a challenge to the state's scheme of judicial elections).

Duckworth fails to make such allegations. First, Duckworth's own success confirms

that members of the Republican Party have not been "shut out of the political process."

Duckworth himself is a "salient, cognizable and elected official of the Republican political

party of Anne Arundel County. . . ." *First Am. Compl.* ¶ 31. Moreover, Duckworth does not

even attempt to plead facts disputing the three-judge court's findings in *Marylanders for Fair*

*Representation,* 849 F.Supp. at 1042-43, of the recent history of the major political parties

in Maryland. The court found no evidence that Republicans have been excluded from the

political process. To the contrary, in *Marylanders for Fair Representation,* the court

determined that Republicans were a "powerful minority within [the State] legislature"; that

"the Democratic leadership is responsive to its interests"; and that "[n]umerous bills that

were sponsored by Republicans are passed by the General Assembly each year."

*Marylanders for Fair Representation,* 849 F.Supp. at 1042-43. Duckworth has failed to

allege that any of those facts have changed since the court's decision in 1994.

Duckworth also elected not to address in his amended complaint or in his

memorandum in opposition to the motion to dismiss the finding by the earlier court that even

though "Maryland has one of the highest concentrations of Democrats of any State in the nation, with Democrats constituting more than two-thirds of the total (two-party) registration," *id.* 1039 n.14, four of Maryland's eight Representatives in Congress are Republicans. These undisputed facts preclude any possibility that Duckworth can show that "Republicans have been shut out of the political process" or that Republicans have "no chance of doing better." Accordingly, Duckworth's claim of political gerrymandering shall be dismissed as insubstantial and frivolous.

### Plaintiff's First Amendment Claim Is Insubstantial

Duckworth's First Amendment claim is likewise insubstantial. Apparently conceding this point, Duckworth has declined to brief this issue. As did the 1991 plaintiffs, Duckworth asserts that Maryland's Congressional redistricting plan violates his First Amendment rights. *First Am. Compl.* ¶ 37. *See Def.'s Ex.* 2 (1991 Complaint ¶71). The court rejected the identical claim, holding that "[n]othing about [the State's 1991 Congressional redistricting plan] affects in any proscribed way the plaintiffs' ability to participate in the political debate in any of the Maryland congressional districts in which they might find themselves," and "[t]hey are free to join pre-existing political committees, form new ones, or use whatever other means are at their disposal to influence the opinions of the congressional representatives." *Anne Arundel County Republican Cent. Comm.*, 781 F.Supp. at 401. The

same is true of the State's 2002 Congressional redistricting plan, notwithstanding anything

Duckworth has alleged. Accordingly, the First Amendment claim fails as a matter of law.[3]

V.

For the foregoing reasons, defendants' motion to dismiss shall be granted. An Order

follows.

Filed: August 5, 2002

ANDRÉ M. DAVIS
United States District Judge

---

[3]In the first amended complaint (lifted from the 1991 complaint), plaintiff alleges that the Maryland General Assembly violated certain 1991 redistricting guidelines in adopting the 2002 plan. *See First Am. Compl.* ¶¶ 14-15; *Defs.' Ex.* 2 (1991 Complaint ¶¶ 21, 50). Defendants argue, and I agree, that Duckworth has no federally-protected right to insist upon compliance with such guidelines as the redistricting standards set forth therein are not required by any provision of the Constitution or the federal law. *See, e.g., Bush v. Vera*, 571 U.S. 952, 963 (1996) ("The Constitution does not mandate regularity of district shape." (citing *Shaw v. Reno*, 509 U.S. 630, 647 (1993))); *Shaw*, 509 U.S. at 647 (explaining that such principles as compactness, contiguity, and respect for political divisions are not constitutionally required (citing *Gaffney v. Cummings*, 421 U.S. 735, 752 n.18 (1973))).

Moreover, the guidelines promulgated in 1991 by then Governor Schaefer's Redistricting Advisory Committee can have no arguable legal significance under federal or state law, because, as plaintiff acknowledges, those guidelines were not readopted by Governor Glendening's Redistricting Advisory Committee, which was convened to advise the Governor on the most recent reapportionment following the 2000 Census. *See First Am. Compl.* ¶ 13. As they were not readopted, they are not binding on Governor Glendening's Redistricting Advisory Committee. *See LeRoux v. Secretary of State*, 640 N.W.2d 849, 861 (Mich. 2002)(concluding that because one legislature cannot bind actions of a future legislature, a new redistricting plan cannot be challenged as violating previously enacted guidelines). Accordingly, this claim, if it is intended to be asserted as such, entitles Duckworth to no relief.